IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

NASIR MUNTASER,

                Plaintiff,                Case No. 3:05 CV 751

-vs-

                                                 <u>MEMORANDUM OPINION</u>

MARGARET BRADSHAW, Warden,

                Defendant.

KATZ, J.

Pending before this Court is the December 29, 2005 Report and Recommendation of the Magistrate Judge addressing a writ of habeas corpus sought by Nasir Muntaser ("Petitioner") and filed pursuant to 28 U.S.C. § 2254. In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. § 636(b)(1)(B) & (C), this Court has made a *de novo* determination of those of the Magistrate's findings to which Petitioner objects. For the reasons enumerated herein, Petitioner's writ is hereby denied.

**I. Background**

The Magistrate's Report and Recommendation cited the following facts, which the Eighth Appellate District, in *State v. Muntaser*, 2003 WL 22455703, 1-2 (Ohio Ct. App. Oct. 30, 2003) found were established at trial.

> Petitioner owned Nick's Superette, a convenience store [("the store")] located on 125th Street in Cleveland, Cuyahoga County, Ohio. Petitioner lost his food stamp license, and in January 2000, he transferred title of the store to Ali Alnajada [("Alnajada")] to operate the store and obtain a new food stamp license. Alnajada paid rent while Muntaser remained the true owner of the store.

The business failed to flourish financially and Alnajada's food stamp license was revoked. Petitioner decided to burn the store and collect the insurance money. He agreed to pay Alnajada $5,000 from the insurance proceeds. Petitioner obtained an insurance policy during the Summer, 2001 which included $55,000 coverage for fire loss. As the legal owner of the store, Alnajada signed the insurance papers. Muntaser made the first premium payment and Alnajada made two subsequent payments.

In January 2002, Petitioner implemented his plans to burn the store by hiring Tayser Marzouk [("Marzouk")] to set the fire. As a part of the plan, Marzouk coordinated the events leading up to the fire. Initially, he staged a break-in by cutting a hole in the wall in an attempt to establish the appearance of neighborhood animosities toward the store and to create a perceived motive for the arsonist. Alnajada threw the cash register on the floor and scattered money and then reported a burglary to the police. A police investigation ensued.

Meanwhile, Marzouk enlisted the assistance of Anthony Pascol [("Pascol")], an acquaintance who believed that Marzouk was the store's owner, to help him move property from the store. On January 22, 2002, Marzouk and Pascol loaded items from the store into Marzouk's van, Pascol went outside and drank a beer. Upon returning into the store, he observed Marzouk spreading gasoline on the floor. Prior to obtaining an explanation from Marzouk regarding the use of gasoline, Marzouk was fatally injured in an explosion. Pascol sustained serious burns. Considerable damage was sustained by the neighboring occupied duplex.

The Cleveland Arson Unit investigator concluded that the gasoline fumes traveled down to the basement, mixing with the pilot light on the water heater and causing an explosion. Alnajada originally denied any knowledge of the fire's origin; however, once he failed a polygraph examination, he confessed to his participation in the plan to burn the store. He wore a wire and obtained a taped conversation in which Petitioner discussed the crime and admitted that he participated in the staged break-in by giving Marzouk the key.

***

Petitioner was arrested and charged in a nine-count indictment alleging one count of murder, seven counts of aggravated arson, and one count of arson (Docket No. 9, Exhibit 2). A jury returned guilty verdicts on all nine counts (Docket No. 9, Exhibit 4). In October 2002, the court imposed a prison term at Lorain Correctional Institution of eight years as to each of counts one, two, three, four, six, seven and eight, one year as to count five; and fifteen years to life as to count nine. Counts one, two, three, four and five were to run concurrently; counts six, seven, and eight were to run consecutively to each other but concurrently with counts one, two, three, four and five but consecutively to count nine. Count nine to run consecutively to counts six, seven and eight and concurrently to counts one, two, three, four and five for a total sentence of 39 years to life (Docket No. 9, Exhibit 5). At the time he filed the Writ, Petitioner was incarcerated at Mansfield Correctional Institution [("MCI")] where Respondent is the warden (Docket No. 1).

> Petitioner filed an appeal in the Court of Appeals for the Eighth Appellate District contesting the validity of the jury instructions, his conviction and sentences. The Court of Appeals affirmed the trial court's judgment (Docket No. 9, Exhibit 9). Petitioner presented the same claims to the Ohio Supreme Court (Docket No. 9, Exhibit 11). The Supreme Court of Ohio denied Petitioner leave to appeal and dismissed the appeal (Docket No. 9, Exhibit 9).
> Petitioner filed supplemental motions in the appellate court (Docket No. 9, Exhibits 14 & 17). The Court of Appeals denied the motion for ineffective assistance of counsel and motion to supplement (Docket No. 9, Exhibits 16 & 18). The Supreme Court of Ohio dismissed the appeal (Docket No. 18, Exhibit 1).
> Petitioner filed a motion for delayed new trial in the common pleas court (Docket No. 9, Exhibit 19). The common pleas court denied the motion for delayed new trial (Docket No. 9, Exhibit 22). The Court of Appeals affirmed the common pleas court denial of the motion for a delayed new trial (Docket No. 9, Exhibit 28). The Supreme Court of Ohio dismissed the appeal (Docket No. 18, Exhibit 2).
> Petitioner filed a Writ for Habeas Corpus pursuant to 28 U. S. C. § 2254 (Docket 1), Respondent filed an Answer (Docket No. 9) and Petitioner filed a Traverse and Brief in support (Docket No. 18).

*Muntaser v. Bradshaw*, Magistrate's Report and Recommendation, No. 1:05-cv-00751, Doc. 19 at 2-4 (N. D. Ohio Dec. 29, 2005) [hereinafter "R & R"].

The Magistrate issued a Report & Recommendation on December 29, 2005 (Doc. 19). Petitioner filed objections on February 8, 2006 (Doc. 23), and Respondent replied on February 13, 2006 (Doc. 25).

**II. Applicable Law**

The amendments to 28 U.S.C. § 2254 under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern federal habeas review of a state court judgment. *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003). Under 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

3

>  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

"[C]learly established federal law, as determined by the Supreme Court of the United States" refers to the holdings of the Supreme Court, as opposed to its dicta, as of the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362 (2000). A state court's decision is "contrary to" Supreme Court principles when the state court applies a rule that contradicts the holdings set forth in Supreme Court cases, or "'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent.'" *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citing *Williams*, 529 U.S. at 405-06). Additionally, "the 'unreasonable application' prong of section 2254(d)(1) permits a federal habeas court to 'grant the write if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (citing *Williams*, 529 U.S. at 413). Further, "a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id*. Finally, a state court's application of a U.S. Supreme Court principle may be found "unreasonable" only if the state court's decision was "more than incorrect or erroneous." It must have been "objectively unreasonable." *Id*. at 520-21.

This Court may only grant a writ of habeas corpus if a petitioner has exhausted the remedies available to him or her in state court. *Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004). A petitioner has not exhausted all state court remedies within the meaning of the doctrine of

4

exhaustion if he or she has the right under state law to raise, by any available procedure, the question presented. *Id.* at 437. The exhaustion requirement is satisfied when the highest court in the state in which the petitioner was convicted has been given a full and fair opportunity to rule on all of the petitioner's claims. *Manning v. Alexander*, 912 F.2d 878 (6th Cir. 1990). In Ohio, the exhaustion requirement is satisfied when the petitioner has exhausted direct and delayed appeals to the Ohio Court of Appeals and Supreme Court. *Id.* at 881-82. Fair presentation of an issue requires that "the same claim under the same theory be presented" for the state court's consideration. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003) (citations omitted).

Absent a showing of cause and prejudice, the procedural default rule set forth in *Wainwright v. Sykes*, 433 U.S. 72 (1977), precludes a federal court from hearing an issue to which the state appellate courts enforced a procedural sanction which constitutes an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir.1986). A procedural default will not bar consideration of a federal claim on habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989). A procedurally defaulted ineffective assistance claim can serve as cause to excuse the procedural default of another habeas claim only if the habeas petitioner can satisfy the "cause and prejudice" standard with respect to the ineffective assistance claim itself. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000).

The Sixth Amendment to the U.S. Constitution guarantees the right to effective assistance of counsel for every defendant. Courts use a two-step "cause and prejudice" process in determining whether a defendant's right to effective assistance of counsel has been violated.

> First the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### III. Petitioner's Assignments of Error

Petitioner asserts several assignments of error, some of which this Court has consolidated for ease of analysis.[1] Petitioner basically objects to the Report and Recommendation on the following grounds: 1) the Report and Recommendation erred in concluding that Petitioner did not exhaust his remedies concerning his claims of ineffective assistance of counsel and that the claims were not substantively meritorious; and 2) his conviction was an unreasonable application of law.

**A. Ineffective Assistance of Counsel**

This Court concludes that Petitioner exhausted his remedies in state court concerning his claim of ineffective assistance of counsel. However, the Court finds his claims of ineffective assistance of counsel to fall short of establishing the cause and prejudice required to justify granting a writ of habeas corpus. Petitioner first alleges ineffective assistance of counsel when his

---

[1] Petitioner also makes other arguments which do not arise from the Report and Recommendation and which include ambiguity of other parts of the jury instructions, procedural defects such as insufficiency of notice, failure to furnish discovery, claims that certain evidence was mishandled, and a host of factual disputes. This Court will not address issues that are not properly before it and were adequately disposed of by the state trial and appellate courts and the federal Magistrate.

6

attorney failed to object to jury instructions. As discussed below, and more fully in the decision of the state appellate court, the instructions do not establish the cause and prejudice required to grant habeas. Next, Petitioner argues that his counsel was ineffective because counsel failed to seek a continuance in the trial until after the week of the first anniversary of 9/11. As explained below, Petitioner has not demonstrated cause and prejudice amounting to a due process violation resulting from this claim.

### 1. Exhaustion

This Court finds that Petitioner's claims for ineffective assistance of counsel were exhausted in state court. They were denied in their final stage by the Supreme Court of Ohio in *State v. Muntaser*, Ohio Sup. Ct. Case No. 05-630 (June 29, 2005). The Report and Recommendation correctly indicates that the claims were presented to the Supreme Court of Ohio. R & R at 4. The state concedes that the claims were exhausted but argues that the ineffective assistance claims are nevertheless procedurally defaulted.

A procedurally defaulted claim of ineffective assistance of counsel can serve as cause to excuse the procedural default of other habeas claims if the habeas petitioner can satisfy the "cause and prejudice" standard with respect to the ineffective assistance claim itself. *Seymour*, supra. This Court will therefore evaluate Petitioner's claims of ineffective assistance of counsel with regard to the jury instructions and the 9/11 references to determine whether the cause and prejudice standard is met.

### 2. Jury Instructions

The Court finds that the trial court's jury instructions did not violate due process. Considering the entirety of the instructions, the Court does not find that the jury could have been reasonably confused by the instructions.

The only possible source of confusion apparent to this Court came in the trial court's use of the word "offender." *State v. Muntaser*, ¶ 18-23. The court first used the term to define "murder:" "'Murder' is causing the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence." *Id.* at ¶ 20. It later used the term in describing the concept of felony murder: "Before you can find the defendant guilty of murder, you must find beyond a reasonable doubt that on or about the 22nd day of January, 2002, and in Cuyahoga County, Ohio, the defendant caused the death of Tayser Marzouk as a proximate result of the offender committing or attempting to commit an offense of violence that is a felony of the first or second degree." *Id.* at ¶ 22. The alleged confusion arises from the apparent discrepancy in the use of the word "offender," which makes it unclear whether the "offender" in the word's second usage must refer to the defendant or some other person (i.e., Marzouk). The state appellate court concluded that there was no prejudicial confusion in the instructions and that the trial court could just as well as have interposed the words "offender" and "defendant." *Id.* at ¶ 23. This Court agrees with the state appellate court that "[t]he instruction simply explains to the jury that it may not find Muntaser guilty of murder unless they also find beyond a reasonable doubt that he caused the victim's death as a proximate result of his committing or attempting to commit an offense of violence." *Id.* As a whole, the instructions are clear on the concept of felony murder, and there is every indication that the jury followed the instructions accurately. The jury found Petitioner guilty of aggravated arson, an offense of violence. Also, the jury found him guilty of

8

felony murder, a determination based on its finding that he was guilty of aggravated arson. The state appellate court performs a well-reasoned and thorough evaluation of other alleged ambiguities in the jury instructions, and this Court agrees with the state appellate court. *See id.* at ¶ 13-34. This Court finds that there was no prejudice resulting from the counsel's failure to object to the portions of the jury instructions to which he has objected.

### 3. 9/11 References

Petitioner next objects to allegedly inflammatory language used by the prosecutor on account of Petitioner's ethnicity. The trial was held during the period commemorating the first anniversary of the tragedies of September 11, 2001. Petitioner argues that it was ineffective assistance of counsel for his attorney not to move for a continuance of the case.

In *State v. Atalla*, 2004 Ohio 3414, 157 Ohio App. 3d 698 (June 30, 2004), a domestic violence case, the prosecutor used inflammatory remarks during jury selection to create bias against the defendant, who was of Middle Eastern descent. During voir dire, for example, the prosecutor asked several tainted questions, including,

> If the person is not from Al-Qaeda, for example, say they don't come from Afghanistan, but they are from a different part of the world, would that – do you still think you would not be able to be objective in that type of situation?

*Id.* at ¶ 19, 703. "By asking these questions, the State essentially told the potential jurors that if they could not be impartial to the perpetrators of [9/11], then [the jurors] could not be impartial to Appellant because he shared the perpetrators' culture, religion, and mindset." *Id.* at ¶ 26, 704-05. Defense counsel failed to object and even perpetuated the problem by asking potential jurors about 9/11 and their feelings towards people of Middle Eastern descent. The appeals court found that

9

this conduct by the attorneys on both sides created cause and prejudice, and therefore constituted ineffective assistance of counsel and a violation of constitutional due process. *Id.* at ¶ 30, 706.

Petitioner Muntaser, who is of Middle Eastern descent, alleges that the prosecutors, one of whom was also of Middle Eastern descent, used the timing of the trial improperly to their advantage by inflaming the passions of the jury. Petitioner alleges that the prosecutors made inflammatory references to his ethnicity, language, and religion, in particular by emphasizing the experience of one of the state's witnesses, also of Middle Eastern descent, who was a translator whose experience included government service after 9/11. If the Petitioner's assertions were true, and if he could have directed the court to specific instances of such conduct in the transcript on the record, then there may well have been a serious constitutional violation which this Court does not take lightly. However, Petitioner not only does not cite specific instances of this conduct, but also his general statements about the conduct do not establish it to have unconstitutionally prejudiced his trial.

Petitioner's allegations specify the state's closing arguments and its bolstering the credibility of one of its witnesses, an Arabic translator. This Court, having read the transcript of the state's closing argument, finds that there was no improper conduct rising to the level of a violation of due process. Additionally, the introduction of an Arabic language translator as a witness was a necessary and standard means to translate documents and recorded conversations in Arabic for the benefit of the court and jury. Establishing his credentials was likewise standard and important, and done in a neutral manner.

At the points in the trial noted by Petitioner (the closing arguments and the introduction of the translator as a witness), there is no mention of the 9/11 anniversary, and no insinuation that

Petitioner's racial, religious, or ethnic background should be noted by anyone. The only mentions of 9/11 are in the qualification of the translator on direct and on redirect. On direct, the state asked the translator several questions about his qualifications. One of his responses was, "I'm assigned to a mult-federal agency task force. And after September 11th, my assignment was in Washington[,] D.C. where I was involved in translating a number of documents left behind by the terrorists, as well as the black box of Flight 93." Tr. at 402. After defense counsel on cross-examination questioned the credibility of the translator for not having been certified by a translation agency, the prosecution on redirect sought to bolster the witness' credibility in part by noting, "[The federal government] trust[s] you to translate important documents such as the ones found right after September 11th." Tr. at 438. These statements occurred on September 10th, 2002. They do not indicate any improper purpose, and are plainly used for the purpose of bolstering the credibility of the witness in light of credibility attacks and an opposing translation that the defense had provided.

There is no mention apparent on the record of the 9/11 anniversary at the opening or closing of that day's sessions. The only mention of Petitioner's ethnicity came on September 18, 2002, in the closing argument by the prosecutor, who was of Middle Eastern descent, when he told the jury, "make no mistake about it, Mr. Muntaser is an Arab-American, but it has nothing to do – his religion, his ethnicity, it has nothing to do with this case. That's what this case is all about, greed. That's what this case is all about." Tr. at 1594. The prosecutor next went on to detail the arson-for-insurance scheme that was the basis for the underlying charges against Petitioner. This statement does not evince any improper motivation by the prosecutor to inflame the passions of the jury under the cause and prejudice standard required by this Court.

11

The Court does not consider the conduct by the prosecution in *Atalla* to be a minimum for finding ethnic denigration and guilt by association amounting to a due process violation – in fact, the *Atalla* court would have been justified in finding a violation based on less inflammatory conduct by either counsel in that case.  But whatever that minimum level of improper conduct is, the facts of the case before this Court do not rise to that level.  There was no misconduct by the prosecutor, defense counsel, or the court.

The Court notes that there was a potential for extra sensitivity towards jurors' passions because this case involved a defendant of Middle Eastern descent and the trial took place on the days before, of, and after September 11, 2002.  Such timing may have been unfortunate, even inappropriate.  However, although it might well have been prudent for the trial court to have considered the ramifications of the timing, as discussed herein, this Court cannot find a due process violation based solely on the date of the trial where there was no misconduct by the prosecutor, the defense counsel, or the court.

**B. Unreasonable Application of Law**

The Court finds that Petitioner's conviction did not involve an unreasonable application of law, and his conviction was supported by sufficient evidence.

Petitioner argues that his conviction by the state trial court constituted an unreasonable application of law in violation of AEDPA.  He argues that Ohio's felony murder statute is unconstitutionally vague and that the crime lacks the constitutional requirement of proximate cause between Petitioner, as the alleged planner of the arson, and the victim, as the actual arsonist.

The Magistrate's Report and Recommendation is clear and accurate on this point, and this Court hereby adopts section II of the Report.  R & R at 9-11.  Ohio's felony murder statute, Ohio

Rev. Code § 2903.02 (B), provides that, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree . . . ." As the Magistrate pointed out:

> Two principles are clear: (1) In Ohio, a defendant may be held criminally liable for the unintended death that results from the commission of a first or second degree felony and (2) an accomplice can be prosecuted as if he or she were the principal offender. In the instant case, the State used aggravated arson as the predicate offense to support the felony murder charge. Petitioner failed to present and the Magistrate did not find contradictory Supreme Court precedent that vitiates the felony murder doctrine or its application to Petitioner's acts. Accordingly, the Magistrate cannot find that the state court's application of the felony murder doctrine was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court or that the state court arrived at a legal holding that contradicts a Supreme Court precedent.

R & R at 11. Petitioner's objection to the application of Ohio's felony murder statute is hereby denied. Pet. Br. at 10-13.

**IV. Conclusion**

For the reasons discussed herein, Petitioner Muntaser's writ of habeas corpus is hereby denied.

IT IS SO ORDERED.

                                                  s/ *David A. Katz*
                                                  DAVID A. KATZ
                                                  U. S. DISTRICT JUDGE